Good morning. May it please the courts, my name is James Patterson and I represent Mrs. Fotoohighiam and her children. That's my best shot at it, Your Honor. And I'd like to reserve a minute or so for rebuttal, if I may. This is a petition for review of a decision of the Board of Immigration Appeals which affirmed a decision of the immigration judge denying relief under the Convention Against Torture for the petitioner and her children. We have argued that the Board of Immigration Appeals erred in making its decision expressly adopting the credibility finding of the immigration judge and then making a finding, essentially trying to adopt a finding that the immigration judge never made. The Board of Immigration Appeals said that we agree with the immigration judge that even assuming the lead respondent's credibility, that was a mistake. The immigration judge never assumed credibility. He clearly found these petitioners to be, the lead petitioner I should say, to be less than credible and denied the claim based upon that. He stated in his decision, which is in the administrative record at page 39, that his finding that she had failed to meet the burden of proof is based on the fact that the respondent is not a credible witness and also based on the fact that the respondent's parents are currently living in Iran and apparently not suffering any harm. But if we were to agree with the IJ and the BIA that she was not credible, then that ends the game. We don't need to care whether the BIA mischaracterized assuming credibility. Is that correct? Your Honor, if you agree that the credibility finding is correct, then yes. That would be the end of our discussion here. And the board did address it in that order. They went first with the express finding of the credibility finding. But again, the board's decision on that credibility finding, and I'll go to that argument now as you've led me. Well, what I'm saying to you, that's the argument you'd better go to. Yes. The credibility finding here is not supported by the record. There is not substantial evidence to support this immigration judge's findings. He made three, noted three factors that led him to his adverse credibility finding. After saying that her testimony didn't have the ring of truth and he gave no support for that, he said that there were important inconsistencies, one of them being that the respondent's or the petitioner's father should fear torture himself instead of going back to Iran. This is not an inconsistency. It fails to take into account the fact that she testified that they have been able to go back to Iran without difficulty, that the father is two steps removed from the problem, the source of the problem, which was the petitioner's husband. The fact that the petitioner's parents are elderly and that unlike in Hakeem, a case cited by the respondent, where that family was similarly situated, that was a case that said that if you've got family that's back in the country, and in that case it was Pakistan, who are similarly situated, then we should be able to consider what they're undergoing and use that to judge your claim. That's not the same situation here. The parents never had difficulty in being classified as not good Muslims. The father was never imprisoned. There is some dispute there. It's not entirely clear. She says that she was threatened that her father could be imprisoned. The administrative record at page 127, she said that the authorities would come and say that they could imprison her father or they would imprison her father. He was not, in fact, imprisoned. He was not beaten. He was not slapped. He was not threatened, as the petitioner was in this case. He's not similarly situated. The fact that he's able to return to Iran was irrelevant. Furthermore, it doesn't go to the heart of the asylum or the Convention Against Torture claim, the fact that her parents could go back, even if you were to find that it's an inconsistency. He also put a lot of weight on the fact that the husband had applied for visas in various countries and that the wife, the petitioner, was unaware of that. She stated several times she wasn't entirely sure what the husband had done, that they communicated only by e-mail, and that he had not told her everything. She did, on a couple of occasions, insist that he would have told her had he gone to a certain country and applied for a visa. But there are lots of husbands who don't tell their wives things, and lots of wives who believe that their husbands tell them everything. That was not an inconsistency, not a reason for this judge to find that she was less than credible. What is the relevance of the husband's conduct? Your Honor, I don't believe there's any relevance to the Convention Against Torture claim. The fact remains that he was outside the country, he's outside the country of Iran, moving about trying to find safe haven. That was never disputed by the government and was supported by the evidence that's in the record. The counsel, wasn't her claim for protection from torture based on her affiliation with her husband? Her husband, she was a derivative, a claimant from her husband, so wouldn't it be material to her claim, her husband's activities? It would be, but the fact that she doesn't know how many different countries he's applied for a visa in is not relevant to whether or not he suffered harm before he left and could be subjected to torture if returned, or that she could be subjected to torture if returned. The husband, as I said, the evidence is clear, the husband's outside of Iran. He left the country and has been trying to find safe haven. The government's evidence of applying for the visa is clear, but the fact that he is in fact trying to find safe haven somewhere. It was not an inconsistency, there was no lie as the immigration judge characterized it regarding what the husband was trying to do and where he was trying to find safe haven. Additionally, the immigration judge was impressed with the fact, or impacted I should say, with the fact that the petitioner didn't recall the exact dates of the Iran-Iraq war and when her husband served in the war. In fact, the record shows that this wasn't an inconsistency either. She initially said she didn't recall exactly and that she had difficulty converting the dates from their calendar to our calendar. She then, though, when pressed, attempted to give a date. She tried to find a frame of reference. I believe it was near the end of the war. Approximately one year before the war ended, after the wedding of a friend, she's doing what we all do to try and find a frame of reference by which she can judge when it was going back in her memory. Eventually, she said, 13 or 14 years ago, the immigration judge inappropriately put in his own personal experiences having served in the war and said that his wife would be able to tell exactly when he served in the war. That's irrelevant. It was inappropriate conjecture and speculation and inserting of the immigration judge's own personal experience to try and judge what was going on here with the petitioner. Similar to the case of, I believe, Wang, the INS, wherein a petitioner there did not recall the exact dates of a second abortion that she underwent in China. That's a pretty significant event. It was not significant enough to go, again, to the heart of the asylum claim in the Wang case. We would argue here that the fact that she didn't recall the exact dates that her husband served in the military, again, don't go to the heart of this claim and were not, in fact, inconsistencies or substantial evidence upon which the immigration judge could appropriately base an adverse credibility finding. Counsel, assuming we agree with you, what evidence is there in the record that the petitioner would more likely than not be tortured upon her return? Your Honor, there is evidence that before she left, both she and her husband suffered severe harassment. I'm not arguing that they suffered torture in the past. I might have argued that they suffered persecution in the past, if the asylum claim were here before the court. But she was slapped, knocked down to the ground, beaten, threatened, told that she would have her husband's body returned to her, and her husband was imprisoned for six months. She was interrogated repeatedly. Her husband was in a cold, dark cell with only a dirty blanket. And then when you take all of that, what happened to them in the past, they were people of interest to the government of Iran. When you take all of that and combine it with what the country reports indicate, that there is widespread use of torture and other degrading treatment, as well as systematic abuses, including extrajudicial killings and summary executions, and look at it in light of the board's decision, which was issued just a few months before the decision in this case, in matter of GA, which was cited in our brief, where they found that an individual from Iran who had been here for many years, and who had been convicted of a drug offense, would likely come to the attention of the Iranian authorities. And then they said, if he does come to the attention of the Iranian authorities, it is more likely than not that he will be tortured. That's a little different than here, where number one, it's a derivative claim, and number two, there is no drug offense involved. Correct. The drug offense was part of it, but just part of it. There were several factors that the Board of Immigration Appeals used. They said he had substantial connections to the United States, had the drug offense, and also that his religion would be a factor, that they would want to talk to him about and could lead to torture. We've got some of those factors here. There is a problem with them being seen as not good Muslims in Iran. There's a religious component to it. There is also the additional component that was not present in G.A. that she had come to the attention of the Iranian authorities before she left. That didn't happen in G.A. Essentially, he left when he was a small boy, had never had any problems in Iran before he left, but now would face problems if he went back. Was the wife considered not a good Muslim, or the husband? I thought it was the husband who was considered not a good Muslim, but there wasn't anything in the record to reflect that she was not. Correct. That specific quote goes to the husband. And again, it's derivative. She was then, by association, targeted. I mean, she was not just asked questions about where your husband is. She was slapped, beaten, knocked down to the ground. They were interested in her. Certainly, her parents, I take that back. That was not in the record. There is an indication she testified that her parents had told her that when they go back, Iranian authorities come and ask questions, that she had been told that she was on a list. They would be going to come to their attention. And if that's the case, the reunion in G.A. where the board says, once you come to their attention, you better look out because torture is so widespread, based on the country reports, we believe that with that, as in G.A., there is a substantial likelihood that it is more likely than not that Mrs. Fotouhimi and her children would suffer torture, they'd come to the attention of the Iranian government upon their return, and that they would, in fact, suffer torture. And I would have gone over my time. We'll give you a minute for rebuttal. Thank you, Your Honor. May it please the Court, Trisha Smith on behalf of the Respondent, John Ashcroft. Substantial evidence supports the Board's determination that the immigration judge correctly determined that Petitioner and her two children are ineligible for protection under the Convention of Torture because, one, Petitioner did not testify credibly that it is more likely than not that she will be tortured if she is returned to Iran. And, two, even assuming that she testified credibly, she did not establish it is more likely than not that she will be tortured if she is returned to Iran. Turning first to the issue of credibility, the Board and immigration judge's conclusion that Petitioner was not credible was based on several factors that go to the heart of Petitioner's claim that she believed that she will be tortured if she returns to Iran because of the government's interest in her husband. Most significantly, the immigration judge determined that Petitioner was not credible because, although she asserted she believed she would be tortured if she returned to Iran because of the government's interest in her husband, she acknowledged that her parents have lived in her home in Iran for four to five months per year subsequent to her leaving Iran, and that her parents have merely been asked some questions by the authorities as to whether they know where she and her husband are. This is the case even though Petitioner asserted that when she lived in Iran, the government would come to their home and harass her and their parents, and even arrested her father. Counsel for Petitioner suggested otherwise, but in the transcript at page 127, Petitioner suggested that the authorities took her father to prison. The immigration judge also determined that Petitioner was not credible based on inconsistencies between Petitioner's testimony and evidence relating to her husband's purported whereabouts after she left Iran and his attempts to enter the United States. Counsel, why is that material? If she doesn't, as opposing counsel said, the fact that she doesn't know what her husband is doing, the fact that he kept information from her, why is that material? As you pointed out, Your Honor, her claim is completely derivative of his claim. And the testimony relates to the timing and ability of her husband to leave Iran and his efforts to enter the United States, which we believe is significantly relevant to her whole claim that she has made. Why is it relevant? I understand you think it's relevant, but why? Because it's derivative. And what she is claiming is her husband wasn't able to leave Iran until 1999. There are suggestions in the record which she disputes, even though there's clear evidence, that he in fact had left prior to 1999 and had actually sought a nonimmigrant visa. So it's completely contradictory to what she's indicated he was doing. She also indicated that any of her If her husband was misleading her, is she to be deemed not credible if she believes her husband? Her testimony, she didn't suggest her husband was misleading her. I mean, even after showing the documents, she tried to suggest that maybe her brother had forged the documents. And when it was pointed out to her, well, how would your brother have had your husband's passport identification number, which was on the visa application that was submitted in Singapore, she acknowledged, well, he probably wouldn't have, because she only received that information during the two most recent hearings. So she stuck to her guns in terms of saying he didn't do it. But yet the documents that were submitted show, in fact, he did do it. But I'm just having trouble. Whether he did or he didn't, if he would be tortured when he went back to Iran, that would be the issue. What he's doing, he may be doing all sorts of desperate things to try to get into the country, and she may or may not know about them. And part of her whole claim, though, is based on his efforts to flee, and that the government is after him, and here's what he's doing, and here's what he's not able to do. So we would suggest that is relevant. But one other thing that I would point out I guess we know that he's out of Iran. We know that he's either trying to get into the country or trying to do certain things. But that hasn't anything to do with whether he would be tortured in Iran. Am I right? I think you're correct in terms of saying, yes, would he be tortured in Iran based on that testimony. I agree with you, Your Honor. We would point out as well, though, while the Court has in asylum cases indicated that the discrepancies must go to the heart of the claim, it hasn't specifically held that with respect to Convention Against Torture claims. And we would argue that under the Supreme Court's decision in Vermont Yankee, that is something for the Board to decide what issues of credibility are relevant, and that it wouldn't necessarily have to go to the heart of the asylum claim. And we don't think this is the case that's right for that, because we think the various reasons the IJ gave for determining the petitioner credible do go to the heart of the claim. I mean, one being, first, the fact that her parents are there, have been able to return there, even though they, like her, were threatened based on the authorities' attempts to locate the husband. And the second... Why aren't they, as counsel says, one step removed, or two steps removed from the husband? They were living there in the same place that the wife and husband were living in. They were questioned just like the wife was. And the wife claimed that the father was even subjected to more than she was in terms of his being put in prison. So they were even – the father was subjected to more harassment of some sort than even Petitioner was when the authorities were coming to them. So I think it's difficult to argue that the father was even more removed than the Petitioner. The third issue... What credible inconsistencies does it take to deny relief? Just one, Your Honor. Well, it has to go to the heart of the claim. Well, again, Your Honor, I mean, we would argue that with respect to Convention Against Torture claims, that has not been resolved by this Court. And we would respectfully say that under a Montagnanchi, that's not necessarily the case. And it's for the Board to decide what issues of credibility are relevant. The third factor the immigration judge pointed to was the fact that despite her assertion that her husband had been sent to the front line in the Iran-Iraq War to be killed, she could not testify to the dates with respect to that. And even though she attempted to, she went back and forth and tried to say, well, it was a year before this or a year after that, all of the time frames also seemed to have taken place after the war actually ended. The Iran-Iraq War was occurring from 1980 to 1988. And at most, it seemed, what she was eventually saying was that it occurred possibly in 1989. So there's some question with respect to all of that. Turning to the issue of burden of proof, we would argue that Petitioner failed to even argue in their brief unless it waived whether they have met the burden of proof assuming credibility. But if we go ahead and look at the issue of burden of proof, we think the I.J. clearly ruled on it, and certainly the Board did. So even if it was argued that the I.J. didn't, well, the Board did. And the Board in doing so could reasonably do so looking at the I.J.'s decision. The I.J. appeared in pages 33 to 37 to discuss the credibility issue, and then pages 37 to 40 to discuss the burden issue. And on page 37, the last paragraph, the I.J. starts to discuss the problem relating to the fact that the parents haven't been able to return to Iran and have not been tortured. And then in his last sentence says, this fact above all others leads this Court to believe that the respondent has not met her burden of proving that she has a clear probability of suffering torture if she's returned to Iran. We believe that indicates that the I.J. clearly determined that, in fact, the burden was not met. And then additionally on page 39, the I.J. provides that the Petitioner has not met the burden and indicates there's two bases, one, that she's not credible, and two, the fact that her parents are currently there and have not suffered any harm. With respect to the – we just note with respect to the country report discussed by Petitioner, that is not part of the record. That's a country report from 1999. If Petitioner had wished to submit additional reports, they could have filed a motion to reopen to indicate that there are changed country conditions, which they may or might not be relevant. The country report that is on record is the – in the record is the 1996 report, and there's nothing in there to suggest that Petitioner would be subject to torture if she returns. Notably, the report states, in recent years, few Iranian claimants for political asylum in the U.S. appear to fit the profile of prominent or politically active people still being monitored by the Islamic authorities and against whom action might be taken. So the country reporting that is in the record supports the I.J.'s determination. In short, because the record evidence supports the Board's and I.J.'s determination that Petitioner is not eligible for protection under the Convention Against Torture and Petitioner has not identified any record evidence that compels a reversal of this determination, we believe the Court should affirm the Board's decision. Thank you, counsel. Rebuttal. We'll give you one minute. Thank you, Your Honor. Just to be clear, quickly, page 127 of the record, counsel says that I'm misrepresenting the record. I am not, if anything, the government is. At the bottom of that page, the Petitioner says, and I quote, they said, they being the Iraqi officials who came to her house, they said they could even take, let's say, my father. They would take my father. They would put him in prison. She says they said that. She doesn't say they did that. They didn't put him in prison. That is not what she said. Counsel says that I'm misrepresenting the record, not the case. Further, she points to the immigration judge's decision saying that he did make a finding as far as assuming credibility. He did not. He said, this finding, the finding that she didn't meet her burden of proof is based on the fact that she's not a credible witness and that her parents are back in Iran right now. But he used the fact that her parents are back in Iran as part and parcel of his credibility finding. That's the first point of his credibility finding. It was all tied up together. Finally, Your Honor, I did not quote from a record that is not from a State Department report that is not in the record. The 99 report is quoted in a matter of GA. I was quoting from the 96 record, State Department report. It's at page 579 of this record, which says Iran has, spurs its widespread influence on the U.S. economy.
judges: Fletcher Hansen, Rawlinson